**IN THE UNITED STATES EASTERN DISTRICT**
**EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| **MICHAEL GAMACHE,** | |
| **PLAINTIFF.** | |
| v. | **Case No.:** |
| **CITY OF ST. LOUIS,**<br>    1200 Market Street<br>    Saint Louis, MO 63103<br>Serve Registered Agent:<br>    City Counselor's Office<br>    1200 Market St. Room 314<br>    Saint Louis, MO 63103 | |
| **DEFENDANT.** | |

## COMPLAINT

COMES NOW Plaintiff Michael Gamache, by and through the undersigned counsel of record, and for his Complaint against Defendant City of St. Louis hereby states and alleges as follows:

## NATURE OF THE ACTION

1. This is an action for race, age discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e *et seq.* and the Age Discrimination in Employment Act of 1967 against Defendant for unlawfully discriminating against Plaintiff Michael Gamache in the terms and conditions of his employment on the basis of his race and age, and retaliating against him for engaging in protected activity.

## THE PARTIES

2. Plaintiff Michael Gamache ("Plaintiff") resides in the State of Missouri.

1

3. Plaintiff is a former Lieutenant of the City of St. Louis Sheriff's Office, having served for over 25 years in various capacities including as a Taser and firearms instructor.

4. Defendant City of St. Louis is a governmental entity, in good standing, with its principal place of business conducted at its municipal offices in St. Louis, Missouri.

5. Defendant was the employer of Plaintiff during the time he was employed.

6. Defendant City of St. Louis directed and controlled the work of Plaintiff.

<u>**JURISDICTION AND VENUE**</u>

7. Original jurisdiction over this suit is conferred on this Court by 28 U.S.C §§ 1331 as it is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 200e *et seq.* ("Title VII") and the Age Discrimination in Employment Act of 1967 ("ADEA").

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the unlawful employment practices occurred in and around City of St. Louis, Missouri, and where Plaintiff suffered the unlawful employment practices and the resultant damages.

9. All conditions precedent to jurisdiction have occurred or been complied, in that Plaintiff filed his administrative charges in a timely manner with the Equal Employment Opportunity Commission ("EEOC").  Copies of the charges are attached hereto as Exhibit A.

10. The EEOC issued Plaintiff Notices of Right to Sue and this lawsuit is filed within ninety (90) days of issuance. The EEOC found cause for discrimination in this case and proactively engaged in the reconciliation process.  Copies of the Notices of Right to Sue are attached as Exhibit B.

11. The U.S. Department of Justice, Civil Rights Division issued Plaintiff Notices of Right to Sue and this lawsuit is filed within ninety (90) days of issuance. Copies of the Notices of Right to Sue are attached as Exhibit C.

## GENERAL ALLEGATIONS

12. Upon information and belief, at all times relevant, Defendant City of St. Louis, through its Sheriff's Office, was and continues to be operating as the chief law enforcement entity of the City of St. Louis, Missouri.

13. Plaintiff began his career with the City of St. Louis Treasurer's Office in July 1996 and transferred to the Sheriff's Office on September 20, 1999.

14. Plaintiff served as a Deputy Sheriff from September 20, 1999, until his promotion to Sergeant in February 2013, and was subsequently promoted to Lieutenant around 2020.

15. During his twenty-five years of service, Plaintiff never received a written reprimand, any dock of pay, or suspension of any kind. Plaintiff received "exceeds standards" on all annual anniversary reviews from his supervisors.

16. Plaintiff served as a Taser and firearms instructor and held numerous other specialized positions within the Sheriff's Office, demonstrating his expertise and value to the department.

17. In approximately 2020, Sheriff Betts hired Deputies Alfred Montgomery and Whitfield Montgomery (hereinafter "Montgomery" and "Whitfield Montgomery" respectively).

18. Deputy Whitfield Montgomery was assigned under Plaintiff's command in the prisoner transportation unit.

19. Deputy Whitfield Montgomery was involved in a vehicle accident and requested his partner Deputy David Gaither to take blame for the accident. When Deputy Gaither refused, Deputy Whitfield reported the accident to Plaintiff.

20. Following department policy, Plaintiff sent Deputy Whitfield for drug and alcohol screening, which he failed, testing positive for a controlled substance, leading to his termination.

3

21. Plaintiff's enforcement of departmental policies and his role in the termination of Whitfield Montgomery created animosity between Plaintiff and the Montgomery family.

22. During the previous election cycle, rumors circulated that if Alfred Montgomery won the election, he would "get rid of all the 'white shirts'" referring to Lieutenants and above.

23. Plaintiff was informed by Whitney Windom that Alfred Montgomery stated publicly at a Carondolet neighborhood meeting that he was going to "clean house and get rid of all white shirts."

24. In February 2020, a photocopy of a flyer from AlfredSheriff.com was found in the employee break room, with a highlighted portion stating "elimination of patronage hiring practices which puts the public at risk."

25. On August 16, 2024, Sheriff Betts went to vote at the Board of Elections at 300 North Tucker Street. A radio call requested supervisor assistance.

26. When Plaintiff arrived, he observed Alfred Montgomery and Barbara Shavers outside the election hall harassing Sheriff Betts.

27. Plaintiff, along with Captain Tim Haill and other supervisors, stood aside to avoid involvement in campaign disagreements. Alfred Montgomery videotaped Captain Haill and Plaintiff, accusing Sheriff Betts of wasting tax dollars.

28. After Montgomery stopped videotaping, Barbara Shavers began yelling and calling them "devils," and Alfred Montgomery stated loudly that he "could not wait to get rid of these white officers."

29. During the 2024 campaign for Sheriff, Montgomery repeatedly made public statements announcing his agenda to terminate supervisors and deputies in order to "cut the budget," targeting senior command staff including Plaintiff.

4

30. On August 6, 2024, Montgomery won the election for Sheriff of the City of St. Louis, taking office on January 1, 2025.

31. Around the first week of September 2024, Deputy Yosef Yasharahla approached Plaintiff and asked if he was going to stay with the Sheriff's Office since there was a new Sheriff coming in.

32. Plaintiff responded that "they would have to drag me out of there" and that he was "not a politician" but a law enforcement officer who works for the Sheriff no matter who that may be.

33. Deputy Yasharahla told Plaintiff that he was going to be Alfred's Colonel (number two position) and that Alfred needed the support of Plaintiff's mother, Kathleen Gamache-Dieckhaus, who had been a committee woman for over forty years.

34. Plaintiff provided his mother's phone number but declined to speak for her politically.

35. Deputy Yasharahla assured Plaintiff that his job was safe and that they wanted to promote him to Captain due to his training and hard work.

36. The following Monday, Plaintiff apologized to Deputy Yasharahla for bringing up the Captains, and Deputy Yasharahla clarified that he was speaking up for Captain Dawn Kehoe-Roop, Major Lammert, and Plaintiff only, but that Captain Haill was "on his own."

37. Days later, Whitfield Montgomery called Plaintiff and said they were hearing rumors that Plaintiff was going to leave the Sheriff's Office. Plaintiff reiterated his commitment to stay.

38. Whitfield assured him that he and Alfred had been talking, knew everything Plaintiff did for the department, wanted to keep him on, and promote him to Captain.

39. Whitfield asked Plaintiff if he thought he could start a SWAT team for the Sheriff's Office. Plaintiff said he didn't have proper certification but would be willing to take training. Whitfield told Plaintiff to store his number and that he would be hearing from him soon.

5

40. Plaintiff shared this news with his family and they celebrated that his job was safe and that he might even be promoted.

41. Around November 14, 2024, Deputy Yasharahla sent Plaintiff a name and phone number. Plaintiff called and spoke with Blake Lawrence, who identified himself as Alfred's attorney and transition team member.

42. Lawrence asked Plaintiff to come by and give him a resume and talk about his position.

43. Plaintiff, under orders from Sheriff Betts not to communicate with Montgomery's team, agreed to meet after hours to drop off his resume and training records. They agreed to meet on November 18, 2024, at 1009 Locust Street, Alfred Montgomery's headquarters.

44. When Plaintiff arrived, Blake Lawrence greeted him and said Alfred Montgomery would be out shortly. Plaintiff was confused as he thought he was just dropping off documents.

45. Montgomery then emerged and they immediately began interviewing him for his position, questioning Plaintiff about his salary and asking why he was making so much money compared to Deputies.

46. Plaintiff explained his twenty-five years of service, promotions through the ranks, and additional duties as Taser and firearms instructor.

47. Montgomery stated he was going to have all supervisors take a pay cut and asked how Plaintiff felt about that. Plaintiff was shocked but said if that was the only way to keep his job, then that's what he would have to do.

48. Before leaving, Plaintiff asked Montgomery to be honest about whether he had anything to worry about, stating he had children and needed an income. Montgomery replied he didn't know at that time, but if they decided not to keep him, he would receive a letter thirty days before termination.

6

49. The next day, Deputy Yasharahla told Plaintiff that he refused to accept a pay cut. Plaintiff corrected this, stating he told Montgomery he felt he deserved his current salary but would accept a pay cut if necessary to keep his job.

50. Deputy Yasharahla asked how much of a pay cut Plaintiff could accept, and Plaintiff said he was willing to go back one or two years on the pay matrix. Deputy Yasharahla said "done" and that he would talk to Montgomery.

51. As the week progressed, rumors from Deputy Kawan Griffin, Sergeant Ali Koenig, and Jasmine Enlow suggested Plaintiff would be okay and might just be transferred, but then rumors that Deputy John Castellano would take his spot began spreading.

52. Between November 18, 2024, and December 2, 2024, Collector Gregory Daly and Alfred Montgomery had a heated discussion about Montgomery's absence from a scheduled meeting with Gregory Daly and Plaintiff's mother, Kathleen Gamache-Dieckhaus, to discuss land tax sales.

53. Plaintiff received threatening text messages from someone using an app, threatening not only his job but his safety and calling him racial slurs on November 24, November 26, and November 28, 2024.

54. Deputy Dashawna Corley made statements to Plaintiff during a reprimand that "it will all be over in January." Plaintiff responded that he was still a Lieutenant and she would respect him.

55. On December 4, 2024, Sheriff Betts told Plaintiff that Alfred Montgomery was in the Carnahan Courthouse lobby asking for supervisors to come see him as he had termination letters for some of them.

56. As Plaintiff walked into the main lobby, Sergeant Buchanan, Captain Haill, and several Deputies were present. Montgomery saw Plaintiff approaching, reached into an envelope, and

7

handed him a termination letter dated December 6, 2024 (two days later than the day it was handed to him).

57. In front of the public and fellow Deputies, Montgomery told Plaintiff that because Sheriff Betts "blew out the budget," he had to let him go.

58. On December 6, 2024, only white supervisors were handed letters in the hallway; other non-white supervisors were told in private or via phone. As Plaintiff returned to his office, Deputies already heard they were getting letters and that it was white supervisors who received them.

59. Plaintiff lost accumulated sick time, vacation time, pension benefits, health insurance, and was unable to work secondary employment which he had done for many years.

60. On January 2, 2025, Sheriff Alfred Montgomery reported to the news that he terminated a "racist gang" running the office, then called it a "racist gang or clique," specifically targeting white supervisors.

61. Plaintiff is a Christian and has never discriminated or made a decision based on anyone's race or sex.

62. Following the terminations, the newly elected Sheriff gave media interviews describing the terminated employees as a "racist gang" running the office and made statements suggesting the terminations were motivated by personal retaliation rather than legitimate business reasons.

63. The termination was part of a systematic pattern of discrimination based on race and age, as well as retaliation for prior employment actions, including Plaintiff's role in the termination of Whitfield Montgomery.

64. Plaintiff, by virtue of his race (white) and age (46 years old), is a member of protected classes of persons.

8

65. At all times relevant herein, the above-named individuals were agents, servants and employees of Defendant and were at all times acting within the scope and course of their agency and employment, or their actions were expressly authorized and ratified by Defendant. Therefore, Defendant is liable for the actions of said persons and/or perpetrators under all theories pled herein.

## COUNT I:
## Race Discrimination – Title VII
## Against Defendant

66. Plaintiff reasserts the allegations set forth in the preceding paragraphs as if fully set forth herein.

67. Plaintiff is white and therefore a member of a protected class under Title VII.

68. Defendant discriminated against Plaintiff in the terms and conditions of his employment.

69. Defendant's conduct constitutes intentional discrimination on the basis of race, with malice and disregard of Plaintiff's rights.

70. Defendant's conduct constitutes disparate treatment and intentional discrimination of Plaintiff based on race.

71. Sheriff-Elect Montgomery repeatedly stated his intention to fire all "white shirts" (Lieutenants and above), which was a reference to white supervisors in leadership positions.

72. On August 16, 2024, Montgomery stated loudly that he "could not wait to get rid of these white officers" while videotaping Plaintiff and other white supervisors at the Board of Elections.

73. On December 6, 2024, only white supervisors were handed termination letters in the public hallway, while non-white supervisors were notified in private or via phone.

74. Plaintiff received threatening text messages containing racial slurs in November 2024.

9

75. Sheriff Montgomery later reported to the news on January 2, 2025, that he terminated a "racist gang" running the office, specifically targeting white supervisors.

76. The pattern of terminations demonstrates race discrimination, as white supervisors were publicly humiliated and terminated while non-white employees were retained or treated with more dignity.

77. Plaintiff's race actually played a role in and had a determinative influence in Defendant City of St. Louis' disparate treatment of him and the tangible employment actions taken against him, to include his termination.

78. Plaintiff's race was, at the very least, a contributing factor in disparate treatment of him and the tangible employment actions taken against him by Defendant City of St. Louis, to include his termination.

79. Management level employees perpetuated the discrimination of Plaintiff based on Plaintiff's race.

80. In addition, management level employees knew or should have known of the discrimination based on Plaintiff's race but failed to address the discrimination and further failed to implement effective and appropriate procedures to stop the discrimination.

81. As a direct and proximate result of Defendant City of St. Louis' actions and/or omissions, Plaintiff suffered intentional discrimination – based upon his race – at the hands of Defendant City of St. Louis during the course of his employment.

82. As a direct and proximate result of Defendant City of St. Louis' actions and/or omissions, Plaintiff has been, and continues to be, deprived of monetary and non-monetary benefits.

10

83. As a direct and proximate result of Defendant City of St. Louis' actions and/or omissions, Plaintiff has suffered, and continues to suffer, garden variety emotional distress and other non-medical bill related compensatory damages.

84. By terminating Plaintiff based on his race, Defendant City of St. Louis, in effect, condoned, ratified, and/or authorized the race discrimination against Plaintiff.

85. The conduct of Defendant was intentional, malicious, in conscious disregard for the rights of Plaintiff and others similarly situated, and reflected a conscious indifference to Plaintiff's protected rights, entitling Plaintiff to an award of punitive damages.

86. Plaintiff is entitled to recover all of his costs, expenses, expert witness fees and attorneys' fees incurred in this matter as well as other appropriate, including equitable, relief.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendant City of St. Louis for an award of compensatory and punitive damages, for his costs expended, for his reasonable attorneys' fees and for such other relief as this Court deems just and proper.

**COUNT II:**
**Age Discrimination – ADEA**
**Against Defendant**

87. Plaintiff reasserts the allegations set forth in the preceding paragraphs as if fully set forth herein.

88. Plaintiff is 46 years old and is therefore a member of a protected class under the Age Discrimination in Employment Act of 1967.

89. Defendant discriminated against Plaintiff in the terms and conditions of his employment.

90. Defendant's conduct constitutes intentional discrimination on the basis of age, with malice and disregard of Plaintiff's rights.

11

91. Defendant's conduct constitutes disparate treatment and intentional discrimination of Plaintiff based on age.

92. During the course of Plaintiff's employment, Defendant City of St. Louis' agent, the newly elected Sheriff, made statements about eliminating "higher paid" employees and "cutting the budget," which was a reference to the higher salaries earned by senior employees due to their years of service and experience.

93. Sheriff-Elect Montgomery questioned Plaintiff about his salary during the November 18, 2024 interview, asking why he was making so much money compared to Deputies, demonstrating focus on compensation levels tied to years of service and age.

94. Montgomery stated he was going to have all supervisors take a pay cut, targeting those with higher salaries earned through years of service.

95. Montgomery publicly stated his intention to hire "young deputies" with increased salaries while terminating experienced, older supervisors.

96. The termination of Plaintiff, along with other senior command staff with years of service, while planning to hire younger employees, demonstrates a pattern of age discrimination.

97. Plaintiff's age actually played a role in and had a determinative influence in Defendant City of St. Louis' disparate treatment of him and the tangible employment actions taken against him, to include his termination.

98. Plaintiff's age was, at the very least, a contributing factor in disparate treatment of him and the tangible employment actions taken against him by Defendant City of St. Louis, to include his termination.

99. Management level employees perpetuated the discrimination of Plaintiff based on Plaintiff's age.

12

100. In addition, management level employees knew or should have known of the discrimination based on Plaintiff's age but failed to address the discrimination and further failed to implement effective and appropriate procedures to stop the discrimination.

101. As a direct and proximate result of Defendant City of St. Louis' actions and/or omissions, Plaintiff suffered intentional discrimination – based upon his age – at the hands of Defendant City of St. Louis during the course of his employment.

102. As a direct and proximate result of Defendant City of St. Louis' actions and/or omissions, Plaintiff has been, and continues to be, deprived of monetary and non-monetary benefits.

103. As a direct and proximate result of Defendant City of St. Louis' actions and/or omissions, Plaintiff has suffered, and continues to suffer, garden variety emotional distress and other non-medical bill related compensatory damages.

104. By terminating Plaintiff based on his age, Defendant City of St. Louis, in effect, condoned, ratified, and/or authorized the age discrimination against Plaintiff.

105. The conduct of Defendant was intentional, malicious, in conscious disregard for the rights of Plaintiff and others similarly situated, and reflected a conscious indifference to Plaintiff's protected rights, entitling Plaintiff to an award of punitive damages.

106. Plaintiff is entitled to recover all of his costs, expenses, expert witness fees and attorneys' fees incurred in this matter as well as other appropriate, including equitable, relief.

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendant City of St. Louis for an award of compensatory and punitive damages, for his costs expended, for his reasonable attorneys' fees and for such other relief as this Court deems just and proper.

**COUNT III:**
**Retaliation – Title VII**
**Against Defendant**

13

107. Plaintiff reasserts the allegations set forth in the preceding paragraphs as if fully set forth herein.

108. Plaintiff engaged in protected activity by enforcing departmental policies, including sending Deputy Whitfield Montgomery for drug and alcohol screening following a vehicle accident, which resulted in Whitfield Montgomery's termination after testing positive for a controlled substance.

109. Plaintiff engaged in protected activity by supporting Sheriff Vernon Betts and performing his duties in accordance with the policies and procedures established under his administration.

110. Montgomery, upon assuming office as Sheriff, engaged in systematic retaliation against Plaintiff for his role in the termination of Whitfield Montgomery and his support of the previous administration.

111. The newly elected Sheriff made repeated public statements promising retaliation against those who supported the previous administration, specifically including Plaintiff.

112. Despite false assurances from Deputy Yasharahla and Whitfield Montgomery that Plaintiff's job was safe and that he would be promoted to Captain, Plaintiff was terminated in retaliation for his prior protected activities.

113. The timing and circumstances of Plaintiff's termination, including the deceptive interview on November 18, 2024, and the public humiliation on December 4, 2024, demonstrate a clear causal connection between his protected activities and the adverse employment action taken against him.

114. Plaintiff's protected activities actually played a role in and had a determinative influence in Defendant City of St. Louis' adverse employment actions against him.

14

115. Plaintiff's protected activities were, at the very least, a contributing factor in Defendant City of St. Louis' adverse employment actions against him.

116. Plaintiff suffered adverse employment action in that he was terminated from employment after he engaged in protected activities.

117. Management level employees perpetuated the retaliation against Plaintiff.

118. In addition, management level employees knew or should have known of the retaliation against Plaintiff, but failed to address the retaliation and further failed to implement effective and appropriate procedures to stop said retaliation.

119. There is a causal connection between Plaintiff's exercise of protected activity and his termination.

120. As a direct and proximate result of Defendant City of St. Louis' retaliatory actions, Plaintiff has suffered and continues to suffer lost wages, lost benefits, emotional distress, humiliation, and other compensatory damages.

121. By terminating Plaintiff in retaliation for engaging in protected activities, Defendant City of St. Louis has condoned, ratified, and/or authorized unlawful retaliation in violation of federal law.

122. The conduct of Defendant was intentional, malicious, in conscious disregard for the rights of Plaintiff and others similarly situated, and reflected a conscious indifference to Plaintiff's protected rights, entitling Plaintiff to an award of punitive damages.

123. Plaintiff is entitled to recover all of his costs, expenses, and attorneys' fees incurred in this matter as well as other appropriate, including equitable relief.

15

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendant City of St. Louis for an award of compensatory and punitive damages, for his costs expended, for his reasonable attorneys' fees and for such other relief as this Court deems just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff hereby requests trial by jury of all issues triable by jury.

Respectfully submitted,

**JUNGLE LAW**

By: <u>*/s/ Lauren Sierra Kruskall*</u>
Lauren S. Kruskall #70464
100 S. 4th Street, Suite 550
Saint Louis, Missouri 63102
Tel:314/314-9111
Fax:816/448-3101
lauren@junglelaw.com

and

**LAUREN ALLEN, LLC**

By: <u>*/s/ Lauren Perkins Allen*</u>
Lauren Perkins Allen, #49845MO
P.O. Box 8533
Prairie Village, Kansas 66208
Telephone: 816.877.8120
Facsimile: 816.817.1120
Email:  lpa@laurenallenllc.com

**ATTORNEYS FOR PLAINTIFF**

16